Charles W. Hingle (Bar No. 1947)
Robert L. Sterup (Bar No. 3533)
Shane P. Coleman (Bar No. 3417)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, Montana  59103-0639
Telephone:  (406) 252-2166
Facsimile:  (406) 252-1669
chingle@hollandhart.com
rsterup@hollandhart.com
spcoleman@hollandhart.com

ATTORNEYS FOR MARC S. KIRSCHNER, AS TRUSTEE
OF THE YELLOWSTONE CLUB LIQUIDATING TRUST

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>Yellowstone Mountain Club, LLC,<br>*et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>Case No. 08-61570-11 |
| MARC S. KIRSCHNER, AS TRUSTEE<br>OF THE YELLOWSTONE CLUB<br>LIQUIDATING TRUST<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>DESERT RANCH LLLP, a Nevada limited<br>liability limited partnership; DESERT RANCH<br>MANAGEMENT LLC, a Nevada limited<br>liability company; TIMOTHY BLIXSETH, an<br>individual; BEAU BLIXSETH, an individual;<br>THORNTON BYRON LLP, an Idaho limited<br>liability partnership; GEORGE MACK, an<br>individual; JOHN DOES 1-100; and XYZ<br>CORPS. 1-100;<br><br>　　　　　　Defendants. | Adversary No. _____<br><br>**COMPLAINT** |

---

[1]　　The Debtors are the following entities: Yellowstone Mountain Club, LLC, Yellowstone Development Club, LLC and Big Sky Ridge, LLC, which entities are substantively consolidated, and Yellowstone Club Construction Co., LLC, which is jointly administered with the other Debtors.

COMES NOW Marc S. Kirschner, as Trustee for the Yellowstone Club Liquidating Trust (the "Trust"), by and through counsel of record, and herein states his causes of action and claims for relief against Desert Ranch, LLLP, Desert Ranch Management, LLC, Timothy Blixseth, Beau Blixseth, Thornton Byron LLP, George Mack, John Does 1-100 and XYZ Corps. 1-100.

## I. INTRODUCTION

1.      This action pertains to numerous transfers of assets by Timothy Blixseth and his affiliated entities to Desert Ranch LLLP and its affiliates and subsidiaries.   This is an action to set aside those fraudulent transfers.  Timothy Blixseth made these transfers in an effort to avoid his obligation to his lawful creditors, including the Trust.  Currently, the Trust and Timothy Blixseth are involved in litigation in AP 09-00014 (hereinafter "AP 14"), wherein the Trust seeks to set aside certain fraudulent transfers made by Timothy Blixseth.  The Trust also seeks a money judgment against Timothy Blixseth for his breaches of his fiduciary duties to the Debtors. The trial of AP 14 is scheduled to continue on February 24, 2010.  After trial, the Trust expects to receive judgment for at least $ 286.4 million.  Indeed, the judgment will come as no surprise to Timothy Blixseth either.  He fully anticipated this large judgment because, as will be shown, he engaged in a fraudulent scheme to attempt to remove his assets from the reach of his creditors. Each of the Defendants named and certain trusts identified herein participated in this scheme to defraud. For the most part, the facts alleged in this Complaint are taken from the deposition of Timothy Blixseth taken by the Trust on January 26, 2010.

## II.  PARTIES

2.      Plaintiff Marc S. Kirschner is Trustee of the Trust.  Pursuant to the Confirmed Plan of Reorganization (the "Confirmed Plan") (case no. 08-61570, dkt. # 947) and Assignments of Claims, the Trust succeeds to "all Causes of Action that the Debtors or their Estates could

assert immediately prior to the Effective Date," except certain claims released by the Confirmed Plan of Reorganization. The causes of action to which the Trust succeeds include the fraudulent transfer and related claims stated in this Complaint.

3.      Defendant Desert Ranch, LLLP ("Desert Ranch") is a Nevada limited liability limited partnership. Desert Ranch is a transferee of the assets for which avoidance is sought by this Complaint. Desert Ranch may be served with process by serving its registered agent Resident Agents of Nevada, Inc., 711 S. Carson Street, Suite 4, Carson City, Nevada, 89701. As will be described more fully herein, Desert Ranch participated in a fraudulent scheme to defraud the Debtors, who are Montana residents. Furthermore, the fraudulent scheme caused harm that Desert Ranch knew would be suffered in Montana.

4.      Defendant Desert Ranch Management, LLC ("Desert Ranch Management") is a Nevada limited liability company. Desert Ranch Management is the general partner of Desert Ranch and as such has an interest in the assets transferred. Desert Ranch Management may be served with process by serving its registered agent Resident Agents of Nevada, Inc., 711 S. Carson Street, Suite 4, Carson City, Nevada, 89701. As will be described more fully herein, Desert Ranch Management participated in a fraudulent scheme to defraud the Debtors, who are Montana residents. Furthermore, the fraudulent scheme caused harm that Desert Ranch Management knew would be suffered in Montana.

5.      Defendant Timothy Blixseth ("Blixseth") is a citizen of the United States and a resident of the State of Washington. Blixseth owns a minority interest in Desert Ranch Management and as such has an interest in the assets transferred to Desert Ranch. He may be served with process at 1000 Second Avenue, 30th Floor, Seattle, WA 98104. Blixseth at one time owned Yellowstone Mountain Club which is located in Montana. He has filed a Proof of Claim in this Court against Debtor Yellowstone Mountain Club, LLC. Furthermore, as will be

described more fully herein, Blixseth participated in a fraudulent scheme to defraud the Debtors, who are Montana residents.  Furthermore, the fraudulent scheme caused harm that Blixseth knew would be suffered in Montana.

6.      Defendant Beau Blixseth, the son of Blixseth, is a citizen of the United States and a resident of the State of Washington.  Beau Blixseth owns a minority interest in Desert Ranch Management and as such has an interest in the assets transferred to Desert Ranch.  He has filed a Proof of Claim in this Court against Debtor Yellowstone Mountain Club, LLC. Furthermore, as will be described more fully herein, Beau Blixseth participated in a fraudulent scheme to defraud the Debtors, who are Montana residents.  Furthermore, the fraudulent scheme caused harm that Beau Blixseth knew would be suffered in Montana.

7.      Defendant George Mack ("Mack") is a citizen of the United States and a resident of the State of Oregon.   Mack as trustee of two trusts owns a minority interest in Desert Ranch Management and as such has an interest in the assets transferred to Desert Ranch.  He may be served with process at 111 SW Columbia Street, Suite 700, Portland, OR 97201.  Furthermore, as will be described more fully herein, Mack participated in a fraudulent scheme to defraud the Debtors, who are Montana residents.  Furthermore, the fraudulent scheme caused harm that Mack knew would be suffered in Montana. Finally, Mack worked extensively in Montana, controlled actions of employees of Mack in Montana and had regular contact with the State of Montana.

8.      Defendant Thornton Byron LLP ("Thornton Byron") is an Idaho limited liability partnership and has filed a Proof of Claim in this Court against Debtor Yellowstone Mountain Club, LLC.  Furthermore, as will be described more fully herein, Thornton Byron participated in a fraudulent scheme to defraud the Debtors, who are Montana residents.  Furthermore, the fraudulent scheme caused harm that Thornton Byron knew would be suffered in Montana.

9.     John Does 1-100 and XYZ Corp. 1-100 and Unidentified Trusts 1-100 are, respectively trusts, unknown individuals, corporations, or other business entities, who are transferees or who facilitated the transfers of the assets described herein, and who will be named in an amended pleading when they are identified.

### III.  JURISDICTION & VENUE

10.    This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334, Standing Order 12 (Revised), U.S. Dist. Ct., D. Mont., and Section 10.1.4 of the Confirmed Plan of Reorganization.

11.    This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Trust hereby consents to entry of final orders and judgment by the Bankruptcy Court.

12.    In the alternative, Counts II - IV are related to the core proceeding stated in Count I for avoidance and recovery of fraudulent transfers to Desert Ranch, as contemplated by 28 U.S.C. §§ 157(a) and 1334.

13.    Venue is proper pursuant to 28 U.S.C. § 1409.

### IV.     RELEVANT FACTS

**A.     Blixseth fraudulently transfers assets to Desert Ranch**

14.    In the summer of 2008, Blixseth and his wife, Edra Blixseth, entered into a Marital Settlement Agreement ("MSA"), pursuant to which the parties divided their marital estate.  Immediately upon consummation of the MSA, Blixseth implemented a scheme to defraud his creditors, including the Debtors.  Specifically, beginning in August 2008, approximately three months prior to the filing of this bankruptcy, Blixseth personally transferred or caused to be transferred virtually all of his assets to Desert Ranch for less than reasonably equivalent value.  At the time he made these transfers, Blixseth knew that the Debtors had

substantial claims against him relating to the Credit Suisse loan and he knew that the Debtors were in serious financial trouble. At the time of the Desert Ranch Transfers, Blixseth was insolvent or became insolvent as a result of the transfers. Blixseth was either insolvent or rendered insolvent by the transfers.

15.     Desert Ranch was created as part of a group of entities specifically designed as vehicles to assist Blixseth in his attempts to shield assets from his creditors.  Defendants Beau Blixseth, Thornton Byron, and Mack each participated in Blixseth's scheme to defraud his creditors.  Beau Blixseth and Mack participated by accepting ownership interests in and control over the fraudulently transferred assets.  Thornton Byron took all of the action described in their billing records as set forth below.

16.     Desert Ranch is a Nevada limited liability limited partnership.  Blixseth owns a 98% limited partnership interest in Desert Ranch.  In other words, Blixseth has a 98% economic interest in Desert Ranch, but allegedly has no control.  Blixseth has admitted, however, that despite of the corporate structure that he controls Desert Ranch.  The 2% general partner of Desert Ranch is Desert Ranch Management, which is a Nevada limited liability company. Blixseth owns 40% of Desert Ranch Management and Beau Blixseth owns 30% of this entity. The remaining 30% ownership in Desert Ranch Management is owned by two trusts with Mack serving as Trustee of those trusts.  Mack is a long time friend and business associate of Blixseth. The foregoing structure is a garden variety asset protection plan.  It seeks to remove assets from "control" of the debtor, Blixseth, so that creditors cannot attach those assets, yet the debtor continues to enjoy the economic benefit of those assets.

17.     Upon information and belief, the following assets have been transferred to Desert Ranch:

a.      One-third ownership interest in Western Pacific Timber, LLC.  The most current valuation from Blixseth's experts in AP-14 values this asset at $40 million;

b.      All ownership interest and/or the assets of Casa 18, LLC, Casa 19, LLC, and Casa 20, LLC.  These three entities own stock in a Mexican company the name of which is not currently known, which in turn owns residential properties in Tamarindo, Mexico.  Blixseth reported that the acquisition costs of these residential properties were approximately $2 million;

c.      50% ownership in a 640-acre parcel of land in Bozeman, Montana referred to as "Section 5";

d.      All ownership interest in and/or the assets of the Buffalo Bill Ranch in Cody, Wyoming.  The most current valuation from Blixseth's experts in AP-14 values this asset at $3.5 million;

e.      All ownership interest in and/or the assets of Western Air & Water (formerly known as Western Aviation & Marine).  The most current valuation from Blixseth's experts in AP-14 values this asset at $25 million;

f.      All ownership interest in and/or the assets of Emerald Cay, Ltd, which owns a private island in the Turks & Caicos.  The most current valuation available to the Trust values this asset at $35 million;

h.      All ownership interest in and/or the assets of Desert Ranch, LLC, which owns 3,000 acres of land, which were transferred into that company by Blixseth.  The most current valuation from Blixseth's experts in AP-14 values this asset at $100 million;

i.      A resort in Mexico known as Tamarindo.  The acquisition cost of this asset was $40 million;

j.   All ownership interest in and/or the assets of the following entities located in the United States: Blixseth Group of Washington, LLC; Friday Records, LLC, Hole 13 Partners, LLC, Kawish, LLC, La Paz, LLC, Little Bear Development, LLC, Lone Moose Meadows, LLC, Mexican Moon Investments, LLC, Overlook Partners, LLC, Renaissance Development, LLC, Resort Acquisition, LLC, Tamarindo, LLC, TWJ Holdings, LLC, YS Collection, LLC, Yellowstone 123, LLC, and Yellowstone L30, LLC, Cody Ranch, LLC, Blixseth Resorts, LLC and Oasis Estate L.P.;

k.   All ownership interest in and/or the assets of the following entities located outside of the United States:  Casa 18, S. De R. L. De C.V., Casa 19, S. De R.L. De C.V., Casa 20, S. De R.L. De C.V., La Paz Conservatory SRL, a Mexican Entity, La Paz Partners Conservancy, S.C., La Paz Development SRL, a Mexican Entity, La Paz Partners SRL, a Mexican Entity, La Paz Partners Development, S. De R.L. De C.V., Operado Tamarindo SRL, a Mexican Entity, Operindo El Tamerindo, S. De R.L. De C.V., Worldwide Commercial Properties, Ltd., a Turks and Caicos Islands Entity, Yellowstone Club World Tamarindo, S. De R.L. De C.V., and Yellowstone Holdings Mexico, S. De. R.L. De C.V.

The transfers of assets described above will be referred to collectively as the "Desert Ranch Transfer" or the "Transferred Assets."

18.   As described in paragraph 14 above, the Desert Ranch Transfers occurred within three months of the Debtors filing their respective petitions for bankruptcy.

19.   Blixseth received an ownership interest in Desert Ranch in exchange for the Transferred Assets.   Specifically, he received a limited partnership in Desert Ranch and a minority ownership interest in Desert Ranch Management, the general partner of Desert Ranch.

However, these interests do not constitute reasonably equivalent value for the Transferred Assets.

20.     Blixseth caused the Desert Ranch Transfers to be made with the actual intent to hinder, delay, or defraud creditors.  As set forth below, just prior to the Desert Ranch Transfers, Blixseth received legal advice with respect to his potential liability to the Debtors and ways in which he could attempt to re-structure his assets to avoid exposure for those liabilities.

21.     Defendants Blixseth, Beau Blixseth and Mack, as persons with ownership interests in Desert Ranch, and the trusts for which Mack is the trustee are individuals or entities for whose benefit the Desert Ranch Transfers were made, or were mediate or intermediate transferees of the Transferred Assets.

22.     The Trust is a creditor of Blixseth and has all of the rights of a creditor to bring avoidance claims under applicable state law.

**B**.     <u>**Thornton Byron's role in the fraudulent transfer scheme.**</u>

23.     This action also pertains to fraudulent transfers of at least $207,597.09 paid to Defendant Thornton Byron.  Thornton Byron is a Boise law firm that performed work for Blixseth personally in connection with his divorce, yet its bills were paid by one or more of the Debtors.  This work included not only advice as to how to structure the divorce to maximize the tax benefit to Blixseth, but also how to "isolate" Blixseth's assets from the imminent bankruptcy that would result from the asset and liability division set forth in the MSA.

24.     Thornton Byron's invoices indicate that its work involved discussions with Blixseth's advisors "regarding Timothy Blixseth's possible liability to creditors of Mrs. Blixseth, Blixseth Group, Inc. or the Yellowstone Club entities [if] Mrs. Blixseth were to assume liabilities of business entities and the marital community on which Timothy Blixseth is currently obligated."  Thornton Byron also addressed the specific problems created if Blixseth's "personal

debt to BGI and from BGI to Yellowstone entities is not repaid as part of sale of Yellowstone Club assets."   Thornton Byron's work contemplated the Yellowstone Club bankruptcy, and analyzed "the proper approach to the restructure of Timothy Blixseth's note in order to protect him from potential forgiveness of debt and thus a potential bankruptcy."   Among other work, Thornton Byron assisted Blixseth with "the potential exposure vis-à-vis a bankruptcy by BGI and/or Mrs. Blixseth to provide maximum protection for Timothy Blixseth."   This work culminated in the transfer of Blixseth's significant assets to Desert Ranch in order to "isolate" these assets from creditors.

25.     These professional services benefited Blixseth personally and did not benefit the Debtors.  Yet, Blixseth and his advisors caused the Debtors to pay Thornton Byron's invoices for this work, and the Thornton Byron firm filed a Proof of Claim in the Consolidated Cases for the amount of its unpaid invoice.   The payment of these invoices for the personal asset planning services provided to Blixseth is recoverable as fraudulent transfers as described herein.

26.     During the four years prior to the Petition Date, the Debtors paid Thornton Byron for professional services that were rendered for the benefit of Blixseth and other non-debtor individuals and entities.  For example, Thornton Byron billed Debtors for at least the following services, which were not for the Debtors' principal benefit:

A.    June 17-08    JCJ    Analysis of Closing Agreement received from Steve Kolodny's office to refine initial analysis of tax and economic concerns presented by same; draft correspondence to Mr. Blixseth and representatives regarding concerns raised by Closing Agreement from tax liability perspective; discussion with George Mack regarding particular concern regarding Mr. Blixseth's possible liability to creditors of Mrs. Blixseth, Blixseth Group, Inc. or the Yellowstone Club entities is [sic] Mrs. Blixseth were to assume liabilities of business entities and the marital community on which Mr. Blixseth is currently obligated; revise correspondence to client and representatives regarding same; analysis of documentation and transactional steps to limit Mr. Blixseth's exposure on subsequent collection efforts with respect to liabilities assumed by Mrs. Blixseth; discussion to analyze same; draft correspondence regarding recommendations for limiting Mr. Blixseth's liability after Mrs. Blixseth's assumption of debt; draft multiple correspondence responding to questions and concerns raised by Mr. Blixseth and other representatives regarding same.

B.    June-10-08    JCJ    NO CHARGE.  Finalize memorandum regarding Code 1031 like-kind exchange and planning to isolate Desert ranch property received with respect to same in separate holding company to limit potential liability; transmit same to client and co-counsel; draft correspondence to co-counsel summarizing same and responding to various issues raised with respect to prospects for like-kind exchange versus global settlement of all property division issues between the Blixseths.

C.    June-09-08    DJT    Address the prior factual analysis of the BGI 1031 exchange and split to finalize in event that such result is reversed; assess possible issues of Mrs. Blixseth is to purchase Mr. Blixseth's interest in BGI; focus on major issues relating to the handling of income and/or loss on the subchapter S return for the period of time up to the division of stock; evaluate the cancellation of debt considerations and potential issues with respect to a bankruptcy.

D.    June-06-08    DJT    Follow up on the status of the revised proposal and address the issues re the potential exposure vis-à-vis a bankruptcy by BGI and/or Mrs. Blixseth to provide maximum protection for Mr. Blixseth.

| | | | |
|---|---|---|---|
| E. | June-02-08 | JCJ | Discussion to analyze concerns raised by possible Code 1031 like-kind exchange of Porcupine Creek for Desert Ranch properties in light of Blixseth Group Inc.'s substantial liabilities and planning options to limit potential adverse consequences of same; analysis of transactional steps involved in transferring Desert Ranch property received in like-kind exchange to new entity to isolate property from BGI's liabilities and potential tax issues presented by same; draft charts outlining steps in transaction to accomplish like-kind exchange and isolation of Desert ranch property from BGI's liabilities and summarizing expected tax consequences of each step in the transaction; technical analysis under related party like-kind exchange rules to determine effect of subsequent transaction on triggering gain recognition rules. |
| F. | May-29-08 | JCJ | Discussion to analyze latest correspondence from Mrs. Blixseth's attorney regarding Porcupine Creek property and intent to seek order that property be distributed in a taxable transaction and appropriate content of declaration requested by Stephen Kolodny in opposition to that plan; discussion with George Mack regarding content of declaration in opposition to Mrs. Blixseth's attempt to force taxable distribution of Porcupine Creek property from BGI and tax consequences of same; draft statements for declaration opposing taxable distribution of Porcupine Creek property from BGI and transmit same to Stephen Kolodny's office; draft correspondence to client addressing questions raised with respect to adverse tax consequences associated with related party Code 1031 like-kind exchanges. |
| G. | May-25-08 | DJT | Address the revised proposal from Edra's attorney, particularly the approach to the next phase of negotiations on the valuation and debt assumption as affected by a purchase by Mr. Blixseth based on Mrs. Blixseth's tax analysis, debt analysis and fair market value analysis; analyze post divorce opportunities pursuant to 1041 and 1031 scenarios to avoid two-year sale penalty on a property sale. |
| H. | May-19-08 | JCJ | Analysis of correspondence from Kolodney and Anteau regarding sudden change in position of Mrs. Blixseth's attorneys with respect to liabilities associated with CSFB loan to Yellowstone entities; draft spreadsheet analyzing known financial information for major assets involved in Blixseth divorce settlement negotiations for use in mediation proceedings with respect to same. |

I.      May-16-08      DJT       Followup on meeting with Messrs. Blixseth, Mack and Kolodny to prepare for the mediation and to establish alternate game plans for Mr. Blixseth to purchase Mrs. Blixseth's interest in BGI; consider opportunities to minimize income tax consequences on distribution of the Palm Desert residence from BGI.

J.      May-14-08      DJT       Meeting and discussions with George Mack regarding our memo and position paper on the structure of the buyout by Mrs. Blixseth; preparation of materials for meeting with Messrs. Koldony, Mack and Blixseth to update strategy and to provide information for the San Francisco mediation regarding a global settlement.

K.      May-12-08      DJT       Continued planning to finalize the tax approach and handle issues for the buyout of Mr. Blixseth vis-à-vis BGI based on a potential spinoff to avoid income tax liability and basis allocation; prepare for meeting with Messrs. Mack, Kolodny and Blixseth regarding the next phase of negotiations.

L.      May-09-08      DJT       Review of financial statement and Yellowstone Club valuation forwarded by Mr. Mack; consider counter proposals and valuation for Mr. Blixseth to retain BGI; consider income tax issues for Mr. Blixseth regarding BGI for 2008 based on who ultimately is awarded BGI and timing of tax allocations.

M.      May-07-08      DJT       Continued planning and tax analysis for BGI and Mr. and Mrs. Blixseth; assessment of the most tax effective means of a potential spinoff based on the proposal by Mrs. Blixseth; consider alternatives such as a direct purchase of a specified asset, an exercise of an option or transfer of an option; review of tax basis to maximize benefits for Mr. Blixseth vis-à-vis existing basis and liability assumption for St. Andrews at the corporate level.

N.      Apr-29-08      GAB       Review technical issues relating to the purchase of Mr. Blixseth's shares of BGI by Mrs. Blixseth and the distribution of certain assets held in the Yellowstone Club entities, including valuation and income tax issues associated with the distribution of the assets, qualification for Code § 355 and limitations on the recognition of loss on distributions of corporate assets.

O.      Apr-29-08      DJT       Discussions with George Mack regarding pursuit of a new option to include the purchase of BGI by Edra Blixseth; analysis of various options to accommodate the revised structure and to allow for minimal tax consequences at the BGI level as well as to Mr. Blixseth; analysis of financial data and prepare outline of additional issues requiring input prior to separation.

| | | | |
|---|---|---|---|
| P. | Apr-28-08 | DJT | Discussions relative to the division of assets; analysis of options regarding major assets of BGI vis-à-vis the Desert properties as well as analysis of the Yellowstone Club limited liability companies in addition to related debt for borrowing from BGI and Mr. Blixseth regarding the debt incurred at the Yellowstone Club; prepare for discussions with Mrs. Blixseth's tax attorneys. |
| Q. | Apr-25-08 | RMW | Review issues related to the preliminary transfer of shares by Tim to Edra; consideration of issues related to the form and illustration of the corporate division; consideration of issues related to basis and debt issues raised by § 368(a)(1)(D); analysis of requirements under § 355; analysis of issues related to continuity of business enterprise with presentation of recommendations for conduct post-distribution; review issues related to reporting requirements for the 355 and factors to be considered in presenting Form 1120S for 2007 and 2008. |
| R. | Apr-25-08 | DJT | Preliminary review and analysis of issues surrounding the income tax returns; scrutinize the BGI assets and restructuring relative to the transfers of various assets into entities to minimize potential 331 gain issues at the corporate level upon distribution. |
| S. | Apr-24-08 | GAB | Detailed analysis of the technical issues and the implementation of a like-kind exchange or § 355 spin off for BGI, Inc., including tax consequences of failed § 355 distribution, impact to the continuing shareholders and exiting shareholders, valuation issues and impact of inclusion of nonoperating assets or boot in the transaction. |
| T. | Apr-23-08 | GAB | Outline issues relating to 2007 income tax reporting for BGI, Inc. in the context of the alternatives for the Porcupine Creek assets and operations, including the reporting of the income and expenses and the description of the business activities of the corporation; review 2005 and 2006 income tax returns and trial balances for the assets and operations of BGI. |
| U. | Apr-23-08 | DJT | Consideration and analysis of the information provided by Messrs. Blixseth and Mark regarding the assets allocated to each party as well as assets which are yet to be divided vis-à-vis the dissolution proceedings; consider options for separation of assets and information to provide to Mrs. Blixseth's attorney. |
| V. | Apr-22-08 | MKF | Review, organization and consolidation of documents relating to property at issue in divorce negotiations; consultation with attorneys on tax returns and financial statements to provide opposing counsel. |

| | | | |
|---|---|---|---|
| W. | Mar-26-08 | JCJ | Technical analysis of tax consequences associated with alternate plan for divorce property settlement under which Mr. Blixseth would receive family estate, Tamarindo and St. Andrews and Mrs. Blixseth would retain all other assets in Blixseth Group, Inc.; prepare spreadsheet to calculate tax costs of alternate property settlement plan; analysis to compare and contrast results under asset sale and redemption of Mr. Blixseth's shares in BGI with alternative property settlement plan. |
| X. | Mar-25-08 | JCJ | Revise memorandum detailing tax consequences in proposed steps for sale of Yellowstone Club assets and redemption of Tim Blixseth's interest in BGI; technical analysis of tax consequences under applicable partnership and corporate tax statutes of alternate plan for accomplishing property division in which limited assets are transferred to Mr. Blixseth immediately and Mrs. Blixseth bears business and tax burdens associated with the sale of the Yellowstone Club assets; revise memorandum regarding sale and stock redemption proposal to reflect unverified nature of financial information used in analysis and to clarify ownership of BGI stock at time of complete redemption. |
| Y. | Mar-11-08 | RMW | Consideration of issues related to liability of the owner of separate property for tax related to the spouse's share of community income under IRS guidance and court cases; analysis of issues related to treatment of community income liability if the spouse to whom the community share belongs fails to pay. |
| Z. | Mar-05-08 | JCJ | Discussion to analyze tax consequences of repaying personal debts as part of sale of Yellowstone Club assets versus retaining debts and paying at later date to improve cash flow; technical analysis of Code 752 and the Regulations thereunder to determine appropriate treatment of liabilities ultimately satisfied or assumed as part of sale of Yellowstone Club assets; revise spreadsheet analyzing tax and financial consequences of Yellowstone Club Asset sale, repayment of personal debts to BGI and from BGI to Yellowstone entities; repayment of Yellowstone Entities' liabilities and redemption of Mr. Blixseth's interest in BGI for interests in LLC holding keeper assets; prepare spreadsheet analyzing tax and financial consequences of proposed transaction if personal debt to BGI and from BGI to Yellowstone entities is not repaid as part of sale of Yellowstone Club assets; discussion regarding cause of higher tax consequence for redemption of BGI shares after repayment of debt versus same transaction without repayment of debt stemming from basis reduction resulting form [sic] distribution of amounts sufficient to satisfy outstanding obligations owed to BGI by the Blixseths and to the Yellowstone Club entities by BGI. |

| AA. | Mar-03-08 | DJT | Followup on discussions relative to the positions taken by the other attorneys for Mrs. Blixseth and the division of the Yellowstone Club; provide data as to the lack of feasibility to successfully completing a 1031 exchange and/or a tax free division and reorganization of assets. |
| BB. | Feb-06-08 | DJT | Final preparation for meeting with Mr. Blixseth and his tax advisors concerning the handling of various aspects of division of assets and sale of assets; meeting to discuss alternatives; address issues and requirements to meet capital opportunity versus ordinary income; analysis of most recent financial data and projections as to the tax consequences of various transactions. |
| CC. | Feb-05-08 | JCJ | Discussion with Chad Herman regarding basis information for keeper assets from Yellowstone Club sale and Porcupine Creek property; draft correspondence regarding same; discussion with George Mack regarding inherent gain in Yellowstone Club keeper assets and basis information for Porcupine Creek property and equipment; discussion to analyze merit and result of Code 1031 exchange of Porcupine Creek property for one-half interest in Royal Land. |
| DD. | Feb-05-08 | DJT | Review, analysis and consideration of all tax issues arising from the Yellowstone Club sale, distribution and separation from Mrs. Blixseth relative to the Palm Desert complex; consider using valuation discounts to minimize issues concerning the Code 311 gain in the real property and the personal property; final review of Mr. Mack's financial data and preparation for meeting in Portland. |
| EE. | Dec-17-07 | JCJ | Revise letter to client regarding qualifying exchange of Porcupine Creek property for undivided, one-half interest in Royal Lane Property as a tax-free exchange under Code 1031; revise memorandum regarding issues presented by proposed Code 1031 exchange including issues related to use of master residence on Porcupine Creek property. |

| FF. | Dec-10-07 | JCJ | Technical analysis of Code, Regulations and case law authority regarding application of related party rules in like kind exchanges of real property to verify that divorced couples are no longer related parties for purposes of applying two year, post-exchange holding requirement and to analyze tax consequences of proposed like kind exchange of interest in properties between Mrs. Blixseth and Blixseth Group Inc.; discussion to analyze same and potential that Mrs. Blixseth would it [sic]qualify for like kind exchange treatment on receipt of property; discussion with George Mack regarding gain characterization and cash flow problems associated with offer for purchase of Yellowstone Club property by third party for combination of cash and assumed debt. |

27. Upon information and belief, similar services were performed by Thornton Byron for Blixseth and other non-Debtor individuals and entities, but paid for by Debtors, in the four years preceding the Petition Date

28. Thornton Byron's time entries in their invoices make clear that this work, and other work, was performed for the benefit of Blixseth and other non-Debtor entities and in furtherance of the fraudulent scheme to attempt to remove assets from the reach of Blixseth's creditors, including the Trust as successor in interest to the Debtors. Indeed, the very purpose of this work was to "isolate" Blixseth's personal assets from the Debtors' liabilities, in the expectation that the Debtors would be forced into bankruptcy. Debtors did not receive reasonably equivalent value for the amounts paid to Thornton Byron for these professional services.

29. When Debtors paid Thornton Byron for these professional services rendered for Blixseth and other non-Debtor individuals and entities, the Debtors' remaining assets were unreasonably small, and the Debtors and their principals should have reasonably believed that the Debtors would be unable to pay their debts as they came due.

30.     When Debtors paid Thornton Byron for these professional services rendered for Blixseth and other non-Debtor individuals and entities, Debtors were insolvent or became insolvent as a result of the payments.

31.     When Debtors paid Thornton Byron for these professional services rendered for Blixseth and other non-Debtor individuals and entities, Defendants were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the payments for these professional services.

32.     The payments were directed to be made by Blixseth, who was acting with the intent to hinder, delay, or defraud creditors of the Debtors.

33.     Thornton Byron has filed Proof of Claim No. 734 in the Consolidated Cases. Thornton Byron's proof of claim includes claims for professional services that were rendered for Blixseth and other non-Debtor individuals and entities.

34.     The Trust has all of the rights of a creditor to bring avoidance claims under applicable state law.

## V.     CAUSES OF ACTION

### COUNT I – AVOIDANCE OF FRAUDULENT TRANSFERS TO DESERT RANCH
(Against All Defendants Except Thornton Byron)

35.     The Trustee hereby restates each and every preceding paragraph, as if specifically stated herein.

36.     The transfers described herein constitute fraudulent transfers under Sections 31-2-333 and 31-2-334 of the Montana Code Annotated and Section 548(a)(1) of the U.S. Bankruptcy Code, and can be avoided pursuant to Section 550 of the U.S. Bankruptcy Code (the "Code") and Section 31-2-339 (1)(a) of the Montana Code Annotated.  The transfers can be avoided as to

every person or entity having an ownership interest in Desert Ranch or Desert Ranch Management.

37.     The transfers were made with the actual intent to hinder, delay, or defraud creditors.  Likewise, Blixseth did not receive reasonably equivalent value in exchange for the transfers.  Blixseth was insolvent within the meaning of Section 31-2-329(a) of the Montana Code Annotated and within the meaning of Section 548(a)(1)(B) of the Code at the time the transfer were made or the transfers rendered him insolvent.

38.     Furthermore, pursuant to section 544(b) of the Bankruptcy Code, the transfers were constructively fraudulent transfer under Mont. Code. Ann. 31-2-333(1)(b), and can be avoided pursuant to section 550 of the Bankruptcy Code and Mont. Code. Ann. 31-2-339 (1)(a). The transfers were made for less than reasonably equivalent value at a time that Blixseth was insolvent or the transfers rendered him insolvent.

39.     Upon avoidance, the Defendants Desert Ranch, Desert Ranch Management, Blixseth, Beau Blixseth, Mack and the trusts for which Mack is the Trustee are jointly and severally liable to convey the Transferred Assets to the Trust or to pay the Trust the value of Transferred Assets described herein.

## COUNT II – AVOIDANCE OF FRAUDULENT TRANSFERS TO THORNTON BYRON
### (Defendant Thornton Byron)

40.     The Trust hereby restates each and every preceding paragraph, as if specifically stated herein.

41.     The Debtors had unpaid creditors whose claims were in existence when Debtors paid Thornton Byron for these professional services rendered to or for the benefit of Blixseth and other non-Debtor individuals and entities, which claims are to be paid through distributions from the Trust.

42.     Pursuant to 11 U.S.C. § 544(b), the payments to Thornton Byron for professional services rendered for Blixseth and other non-Debtor individuals and entities, were fraudulent transfers under Mont. Code Ann. §§ 31-2-333, -334.

43.     The payments to Thornton Byron for professional services rendered to or for the benefit of Blixseth and other non-Debtor individuals and entities were fraudulent transfers under 11 U.S.C. § 548.

44.     Accordingly, the payments to Thornton Byron for professional services rendered to or for the benefit of Blixseth and other non-Debtor individuals and entities may be avoided pursuant to 11 U.S.C. § 550.

45.     Upon avoidance, Thornton Byron must pay the Trust the amount of the payments to Thornton Byron for professional services rendered for Blixseth and other non-Debtor individuals and entities.  These amounts total at least $207,597.09.

## COUNT III – CLAIM OBJECTION
### (Defendant Thornton Byron)

46.     The Trust hereby restates each and every preceding paragraph, as if specifically stated herein.

47.     For the reasons stated above and the other reasons stated in the Trustee's Objection (case no. 08-61570, dkt. #1382), Thornton Byron's proof of claim should be disallowed.

## COUNT IV – PRELIMINARY INJUNCTION
### (All Defendants)

48.     The Trust hereby restates each and every preceding paragraph, as if specifically stated herein.

49.     The Trust requires injunctive relief to maintain the status quo and prevent any further transfer or dissipation of assets.

50.     The Trust has alleged several causes of action against the Defendants, and as indicated in this Complaint the Trust has shown a probable right of recovery and likelihood of success on the merits, the Trust will suffer imminent, irreparable harm without Court intervention, and there is no adequate remedy at law.

51.     As a direct and proximate result of the Defendants' wrongful actions as alleged in this petition, the Trust will suffer imminent injury that will be irreparable and for which no remedy at law exists without the protections of injunctive relief.

52.     The only adequate, effective, and complete relief to the Trust is to restrain the Defendants from further engaging in certain proscribed activities, as set forth below.  Pursuant to Fed. R. Civ. P. 65 (a) and Bankruptcy Rule 7065 and in order to preserve the status quo during the pendency of this action,  the Trust seeks upon hearing, a preliminary injunction, ordering and immediately restraining the Defendants, including the Defendants' agents, servants, employees, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them from transferring, concealing or otherwise dissipating any of the Transferred Assets or any asset currently held by Desert Ranch.

WHEREFORE Plaintiff prays:

A.     For an Order of this Court that the Desert Ranch Transfers be set aside and avoided;

B.     For judgment against Desert Ranch and all immediate and mediate transferees of the Desert Ranch Transfers, including Blixseth, Beau Blixseth, Mack, Desert Ranch Management and the trusts for which Mack is Trustee requiring the conveyance of the Transferred Assets to the Trust or for the value of the Transferred Assets;

C.      For judgment against Desert Ranch, Desert Ranch Management, Blixseth, Beau Blixseth and Mack, as parties for whose benefit the Desert Ranch Transfers were made, for the value of the Transferred Assets;

D.      For judgment against the Thornton Byron in an amount of not less than $207,597.09 for the fraudulent transfers of the professional payments described herein;

E.      For an order against Blixseth, Desert Ranch, Desert Ranch Management, Beau Blixseth, Mack and the trusts for which Mack is Trustee enjoining the sale, transfer, or encumbering of all assets currently held by Desert Ranch and all personal and real property associated with Desert Ranch's membership or shareholder interests in any other entity related to the Transferred Assets;

F.      For prejudgment interest;

G.      For attorneys' fees and costs; and

H.      For such other and further relief that the Court deems proper.

Dated:  February 19, 2010.

/s/ Shane P. Coleman
Charles W. Hingle
Shane P. Coleman
Robert L. Sterup
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, Montana  59103-0639
ATTORNEYS FOR MARC S. KIRSCHNER,
TRUSTEE OF THE YELLOWSTONE CLUB
LIQUIDATING TRUST

4737355_1.DOC