UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC**,<br><br>Debtor. | Case No. **08-61570-11** |
| **BRIAN A. GLASSER, AS SUCCESSOR TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**,<br><br>Plaintiff.<br><br>-vs-<br><br>**DESERT RANCH LLLP, DESERT RANCH MANAGEMENT LLC**, **TIMOTHY L BLIXSETH**, **BEAU BLIXSETH, THORNTON BYRON LLP**, George Mack, **JOHN DOES 1-100**, and **XYZ CORP. 1-100**,<br><br>Defendants. | Adv No. **10-00015** |

## MEMORANDUM of DECISION

At Butte in said District this 14th day of March, 2014.

Marc S. Kirschner, the former Trustee for the Yellowstone Club Liquidating Trust

1

("YCLT")[1] commenced this Adversary Proceeding on February 19, 2010, seeking, among other things, the disallowance of Thornton Byron LLP's Proof of Claim and to recover from Thornton Byron LLP, pursuant to 11 U.S.C. §§ 544, 548 and 550, at least $207,597.09 that was paid by the Debtors[2] to Thornton Byron LLP between April 8, 2008, and June 23, 2008.  On November 19, 2013, YCLT filed at docket no. 194 a Rule 7056 F.R.B.P. Motion for Summary Judgment Against Defendant Thornton Byron LLP, seeking avoidance of the $207,587.00 that Thornton Byron LLP received for professional services rendered to Debtors, Timothy L. Blixseth ("Blixseth") and other non-Debtor individuals and entities and disallowance of Thornton Byron LLP's Proof of Claim No. 734, together with prejudgment interest, costs and all such other relief as this Court may deem just and proper.  The aforementioned motion was accompanied by a brief, a statement of uncontroverted facts and a request that the Court take judicial notice of Proof of Claim No. 734-1 filed by Thornton Byron LLP in Debtor's main bankruptcy case, the Trustee's objection thereto and the Order continuing the hearing on the Trustee's objection to Proof of Claim No. 734-1.  The Trustee also requested that the Court take judicial notice of a Memorandum of Decision entered by this Court in Adversary Proceeding No. 09-00014 ("AP-14"), and certain trial testimony given by John Thornton in AP-14.  The Court granted the Trustee's request for judicial notice to the extent permitted under the Federal Rules of Evidence.

---

[1]  On July 22, 2013, YCLT filed a motion to substitute Brian A. Glasser for Marc S. Kirschner as Successor Trustee of YCLT, which motion the Court granted.

[2]  The Debtor entities associated with this Adversary Proceeding are Yellowstone Mountain Club, LLC (Case No. 08-61570), Yellowstone Development, LLC (Case No. 08-61571), Big Sky Ridge, LLC (Case No. 08-61572), and Yellowstone Club Construction Company, LLC (Case No. 08-61573).  The four aforementioned limited liability companies comprise the Yellowstone Club and will be referred to generally as the Debtors or the Yellowstone Club entities.

Thornton Byron LLP opposes YCLT's motion for summary judgment and also filed a statement of material issues and numerous affidavits in opposition. Thornton Byron LLP disputes many of YCLT's asserted facts on grounds this Court's August 10, 2010, Memorandum of Decision issued in AP-14 is not binding on Thornton Byron LLP. In its Response filed at docket no. 225, p.5-6, Thornton Byron LLP summarizes its position:

> First, the Bankruptcy Court does not have the constitutional authority to enter a final judgment under *Stern v. Marshall*, 131 S.Ct. 2594 (2011) and *Executive Benefits Insurance Agency, Inc. v. Arkison (In re Bellingham Insurance Agency, Inc.)*, 702 F.3d 553, 565 (9th Cir. 2012). Second, the Plaintiff has failed to carry his burden to obtain summary judgment. Numerous genuine issues of material fact preclude entry of summary judgment against Thornton Byron. In particular, Thornton Byron is not bound by this Court's decision in *Blixseth v. Kirschner* because Thornton Byron was not a party in that proceeding. The Memorandum of Decision recites numerous facts showing that the Debtors were paying their debts as they became due, and that the Debtors were solvent. Furthermore, the facts show that the Yellowstone Club directly or indirectly received benefit from the services provided by Thornton Byron. The Court should note that new evidence cannot be presented in a reply brief, and may be stricken. *Nautilus Group, Inc. v. Icon Health and Fitness, Inc.*, 308 F. Supp. 2d 1208, 1214 (W.D. Wash. 2003) (granting motion to strike when new evidence was submitted with reply memorandum) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)).

Thornton Byron LLP also argues that YCLT's claim is subject to Mont. Code Ann. ("MCA") § 31-2-340(4).

YCLT filed a reply on January 10, 2014, at docket no. 236, reiterating that this Court has the Constitutional authority to enter a final judgment against Thornton Byron LLP, that collateral estoppel bars Thornton Byron LLP from relitigating the findings of fact and conclusion of law made by this Court in AP-14 and that Thornton Byron LLP provided no economic benefit to the Debtor. YCLT also argues that Thornton Byron LLP failed to present any evidence that would entitle it to a good faith defense.

Thornton Byron LLC promptly filed on January 13, 2014, a motion to strike that portion of YCLT's Reply addressing collateral estoppel.  YCLT opposes Thornton Byron LLP's motion to strike.

After due notice, a hearing on the motion to strike and the motion for summary judgment was held February 11, 2014, in Butte.  Attorney Shane P. Coleman of Holland & Hart LLP, of Billings, Montana, appeared and argued on behalf of YCLT; attorney Daniel J. Gibbons of Witherspoon Kelley of Coeur d'Alene, Idaho, appeared and argued on behalf of Thornton Byron LLP.  No testimony or exhibits were admitted into evidence.

**I.     Thornton Byron, LLP's Motion to Strike.**

Thornton Byron LLP argues that YCLT, in its Memorandum of Decision, "did not mention collateral estoppel, did not mention privity and did not mention attorneys being bound by judicial decisions involving the attorney's clients."  Memorandum, Docket No. 238, p.2.  The Court disagrees.  YCLT argued in its Memorandum filed at docket no. 195 that Thornton Byron LLP "cannot challenge (here) any of those findings and conclusions [in AP-14] because of the preclusive effect of that judgment against Blixseth and his proxies, e.g., his attorneys at [Thornton Byron LLP]."  Later in that same Memorandum, YCLT cites *Taylor v. Sturgell*, 553 U.S. 880, 128 S.Ct. 2161, 2173, 171 L.Ed.2d 155 (2008) for the proposition "that issue preclusion is appropriate when a nonparty later brings suit as an agent for a party who is bound by a judgment."

Issue preclusion is also known was collateral estoppel.  YCLT's statement of undisputed facts, along with the brief in support of the motion for summary judgment, as discussed above, should have put Thornton Byron LLP on notice that YCLT was relying on the doctrine of issue

preclusion to bind Thornton Byron LLP to certain findings and conclusions this Court made in AP-14. Therefore, Thornton Byron LLP's Motion to Strike is denied.

        II.       **YCLT's Objection to Proof of Claim No. 734.**

Thornton Byron LLP filed Proof of Claim No. 734 on May 21, 2009, asserting a claim of $35,978.00 for legal services performed. On December 18, 2013, at docket no. 2539, Thornton Byron LLP, through counsel, moved to withdraw Proof of Claim No. 734. After expiration of the 14-Notice period, as provided in the Notice attached to Thornton Byron LLP's December 18, 2013 motion and in accordance with Mont. LBR 9013-1, the Court entered an Order on January 3, 2014, at docket no. 2540, granting Thornton Byron LLP's motion to withdraw its proof of claim. The withdrawal of Thornton Byron LLP's Proof of Claim No. 734 renders YCLT's objection to claim filed in the Debtor's main bankruptcy case at docket no. 1382 and Count III of YCLT's complaint moot. Therefore, YCLT's request for summary judgment on Count III of its complaint is denied and Count III of YCLT's complaint is dismissed.

        III.      **11 U.S.C. § 548**.

The undisputed facts show that Thornton Byron LLP performed legal work for Blixseth and various of his affiliated entities between May 1, 2007, and June 1, 2008. The legal work that Thornton Byron LLP performed is itemized in the invoices set forth in Exhibits 1 through 11 attached to YCLT's statement of uncontroverted facts, and could generally be characterized as formation of business entities for asset protection and estate and tax planning. Thornton Byron LLP also did extensive research on the tax consequences of various property settlement scenarios that arose during the course of Blixseth's divorce. Thornton Byron LLP sent its invoices to Blixseth "c/o George E. Mack, CPA, 4380 SW Macadam, Ste. 590, Portland, OR 97201." The

5

invoices were routed by Blixseth and/or his accountant, George E. Mack, to the Debtor for payment. Prepeition[3], and sometime after September 4, 2007, but prior to mid-August 2008, the Debtor paid $207,587.00 to Thornton Byron LLP for the legal services set forth in Exhibits 1 through 11. YCLT contends that the legal services were not for services performed on behalf of the Debtor, but rather, were performed on behalf of Blixseth and other of his entities.[4] For instance, an entry on Invoice No. 11242 dated June 4, 2007, reads as follows:

> May-10-07   KAR   Online research in Nevada and California for name availability of Salton Development Company, Salton Acres LLC, Oasis Park LLC, Oasis Estate Management LLC, Desert Ranch Management LLC, Desert Ranch LP and Oasis Estate LP; multiple discussions with George Mack's office to obtain relevant information about Beau Blixseth; prepare Articles of Incorporation for Salton Development Company and email to Cal-Title Search filing; request reservation of all other names in California; email correspondence with Cal-Title Search to clarify questions regarding term of reservations and renewals; prepare Articles of Organization for the four LLCs and Certificates of Limited Partnership for the two limited partnerships; fax to Resident Agents of Nevada with instructions for filing; confirm with Resident Agents of Nevada entities have been filed; confirm with Cal Title-Search that the California corporation is in process, the name reservations have been filed and the renewal schedule for the name reservations; begin preparation of all ancillary documents for the new entities, including Forms SS4, Application for Employer Identification Number, Bylaws, Subscription Agreements and Operating Agreements for the LLCs.

Exhibit 1, docket no. 196, p.4. The following are further examples of entries made in June 2008:

> Jun-11-08   JCJ   Discussion regarding current status of divorce property settlement negotiations to determine issues presented by most recent proposal

---

[3] The Debtor sought protection under Chapter 11 of the Bankruptcy Code on November 10, 2008.

[4] Thorton Byron LLP appears to concede that only about 10 percent of the services described in Exhibits 1 through 11 benefitted the Debtors, either directly or indirectly.

6

|  |  |  |
|---|---|---|
|  |  | from Mrs. Blixseth; draft correspondence to client and co-counsel regarding same and outline problems we identified with proposed transaction; discussion with George Mack regarding future communications regarding tax matters associated with divorce settlement negotiations. |

* * *

|  |  |  |
|---|---|---|
| Jun-09-08 | JCJ | Analysis of Closing Agreement received from Steve Kolodny's office to refine initial analysis of tax and economic concerns presented by same; draft correspondence to Mr. Blixseth and representatives regarding concerns raised by Closing Agreement from tax liability perspective; discussion with George Mack regarding particular concern regarding Mr. Blixseth's possible liability to creditors of Mrs. Blixseth, Blixseth Group, Inc. or the Yellowstone Club entities is [sic] Mrs. Blixseth were to assume liabilities of business entities and the marital community on which Mr. Blixseth is currently obligated; revise correspondence to client and representatives regarding same; analysis of documentation and transactional steps to limit Mr. Blixseth's exposure on subsequent collection efforts with respect to liabilities assumed by Mrs. Blixseth; discussion to analyze same; draft correspondence regarding recommendations for limiting Mr. Blixseth's liability after Mrs. Blixseth's assumption of debt; draft multiple correspondence responding to questions and concerns raised by Mr. Blixseth and other representatives regarding same. |

Exhibit 11, pp. 6 and 8. In addition to the fact that the bills were addressed to Blixseth, and not the Debtor, YCLT also argues, and Thornton Byron LLP does not dispute, that no engagement letter exists between the Debtor and Thornton Byron LLP. It also appears that Thornton Byron LLP may be seeking to protect certain documents from discovery by asserting the attorney-client privilege on behalf of someone other than the Debtor. YCLT also argues that Debtor was insolvent when it made the payments to Thornton Byron LLP.

Turning to the merits of YCLT's claim, "Federal bankruptcy law, like state fraudulent transfer law, generally allows a creditor to ask the court to void certain transfers if the creditor

can establish either actual fraud or constructive fraud. An actual fraud theory alleges that the debtor transferred assets within a specified period before filing for bankruptcy and that the debtor did so with a fraudulent intent. Constructive fraud proceeds on the theory that, although the debtor may not have had a fraudulent intent, the court nevertheless should void the transfer, usually because the debtor received inadequate consideration." *In re Bledsoe*, 569 F.3d 1106, 1109 (9th Cir. 2009). Factors a plaintiff must establish under § 548 are: (1) that the debtor incurred an obligation; (2) within two years of its bankruptcy petition date; (3) that the debtor received less than reasonably equivalent value for the obligation incurred; and either (4) was insolvent at the time the obligation was incurred or was rendered insolvent as a result of the obligation, or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital. 11 U.S.C. § 548(a)(1)(B); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994); *In re Fritz*, 225 B.R. 218, 224 (E.D. Wash. 1997); *Hussey v. Haider (In re Haider)*, 126 B.R. 796, 798 (Bankr. D.Mont.1991).

As noted above, YCLT, to prevail, must show that the Debtor was insolvent when it made the payments to Thornton Byron LLP. A debtor is insolvent if it fails any one of three solvency tests, namely, the Balance Sheet Test, Cash Flow Test, or Adequate Capital Test. On the issue of solvency, YCLT asserts that the following facts are undisputed:

> 2. In the course of rendering the advice and services itemized and described in Exhs. 1-11, THB learned and actually knew and understood that TB and/or Mack believed YMC was insolvent or imminently insolvent. (Exh. 11; Exh. 17, p. 108).
>
> 8. As of the date[s] that THB accepted and negotiated the YMC checks, THB actually knew or should have known that YMC was insolvent or imminently

insolvent because THB was actively assisting TB in shielding his personal assets from the claims of YMC's creditors. (Exh. 11; Exh. 17, p. 108).

10. The THB Invoices "illustrate[ ] [that] … Blixseth and his advisors were contemplating the financial demise of the Yellowstone Club and … were developing a plan to shield Blixseth from the fallout … [that] involved the creation of Desert Ranch LLLP, a structure referred to by his attorney [John Thornton of THB] as a 'personal Berkshire Hathaway' that provided 'general creditor protection.'" (Exh. 17, pp. 108-109; Exh. 21).

12. "Mordy testified that the Debtors were insolvent upon consummation of the MSA [Marital Settlement Agreement] on August 13, 2008 … [and] the Court finds on whole that Mordy's testimony was credible and his opinions reliable for purposes of this Adversary Proceeding." (Exh. 17, pp. 113-114).

13. "As a result of the [September 30, 2005] Credit Suisse transaction, the Debtors were unable to pay their bills as they became due." (Exh. 17, p. 100).

14. "[T]he Debtors were insolvent at the time of the release [granted to TB in the MSA, June 26, 2008]" (Exh. 17).

15. The Court's findings after Part I of the trial included "findings of insolvency as to the Debtors on a cash flow basis and capital adequacy basis as of September 30, 2005." (Exh. 17, p. 78).

16. "The Debtors were not current on their accounts payable in August of 2008." (Exh. 17, p. 29).

17. As of March 6, 2008, TB had failed to pay THB bills totaling $53,599.84 that were more than 180 days past due. [June/July/August/September 2007 Statements unpaid as of 3/6/08 per THB fax]. (Exh. 16).

With the exception of fact 17, YCLT claims the above facts are undisputed and cites to this Court's August 10, 2010, Memorandum of Decision entered in AP-14. In the Brief filed in support of the motion for summary judgment, YCLT argues:

> [Thornton Byron LLP] cannot now contest any of those findings and conclusions [this Court made in AP-14] because allowing [Thornton Byron LLP] to do that would permit Blixseth's close allies/advisors to mount a collateral attack as his proxy. *See, e.g., Taylor v. Sturgell*, 128 S. Ct. 2161, 2173 (2008), ("… seems clear that issue preclusion is appropriate when a nonparty later brings suit as an agent

> for a party who is bound by a judgment."). Blixseth is bound by the judgment in AP14 and proxies, e.g. THB, cannot here relitigate or challenge this Court's findings and conclusions of law in AP14. The Bankruptcy Code also precludes [Thornton Byron LLP] from re-litigating this Court's findings and conclusions in AP14 because the Code constitutes "a special statutory scheme [that] may 'expressly forclos[e] successive litigation by nonlitigants …'" *Id.*

Memorandum, docket no. 195, p.7.

*Taylor v. Sturgell*, cited above by YCLT, is a preclusion case in which the Supreme Court of the United States recognized that preclusion can be applied to non-parties notwithstanding the often repeated general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor*, 553 U.S. at 892 (citing *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 132 A.L.R. 741, 85 L.Ed. 22 (1940)). The Supreme Court in *Taylor* noted that as with most rules, this one is subject to certain pliable exceptions: (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempted to relitigate issues through a proxy; or (6) a statutory scheme foreclosed successive litigation by non-litigants. *Taylor v. Sturgell*, 553 U.S. at 892.

A brief discussion of AP-14 shows why none of the exceptions discussed in *Taylor* apply in this case. The August 10, 2010, Memorandum of Decision in AP-14 was the result of two phases of trial; Part I of the trial was held in Missoula on April 29, April 30, May 1, May 4, 5 and 6, 2009; and Part II of the trial was held February 24, 25 and 26, 2010, in Missoula. During Part I of the trial, Blixseth presented very little in the way of a defense and instead relied on the

defenses offered by Credit Suisse. Following Part I of the trial, the Court wrote in a Memorandum of Decision entered June 11, 2009:

> The evidence to date is not favorable for Blixseth. However, this Court is very cognizant of how fast this matter went to trial, and thus, the Court will keep the record open and will set a further scheduling conference in August. At that time, the Court will schedule a continued trial date at which the parties will be afforded additional time to present additional evidence for and against Blixseth. By keeping this record open and allowing Blixseth additional time to prepare for trial, the Court will permit Blixseth an opportunity to further develop the merits of his case[.]

As indicated above, Blixseth's role in Part I of the trial was more akin to that of an observer as opposed to a litigant. Blixseth did, however, take an active role in Part II of the trial.

In an abbreviated summary,[5] the facts giving rise to AP-14 are as follows: Blixseth caused Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, and Big Sky Ridge, LLC to borrow $375 million from Credit Suisse, Cayman Islands Branch, pursuant to a First Lien Credit Agreement. The Debtors received the Credit Suisse loan proceeds on September 30, 2005. On that same date, Blixseth transferred $209 million of the loan proceeds to Blixseth Group, Inc. ("BGI"), an Oregon sub-S corporation, that was owned solely by Blixseth as President and CEO from 1999 to August 12, 2008. The immediate transfer of funds out of the Yellowstone Club to BGI and then to Blixseth was not memorialized in any contemporaneous loan documents. The $209 million was originally recorded in a suspense account though a journal entry. As a result of threatened litigation, Blixseth later drafted a two-page promissory note in the amount of $209 million and reclassified the $209 million journal entry as a note receivable from the managing member. The $209 million unsecured demand note, payable by

---

[5] Just the facts in the Court's August 10, 2010, Memorandum of Decision in AP-14 span more than 60 pages.

11

BGI to the Debtors was drafted in May 2006, but was backdated to September 30, 2005. At or about the same time, BGI also executed a promissory note, payable on demand and dated September 30, 2005, in favor of Yellowstone Mountain Club, LLC in the amount of $7.8 million, and a third promissory note, payable on demand and dated September 30, 2005, in favor of Yellowstone Mountain Club, LLC in the amount of $55,798,796.68.

Blixseth and his spouse, Edra, separated sometime in 2006 and Blixseth retained sole control of the Yellowstone Club and BGI until August of 2008, when Edra was awarded BGI and the Debtors as part of a June 26, 2008, confidential Marital Settlement Agreement. As part of the Marital Settlement Agreement, both Blixseth and Edra received full and comprehensive releases from the other party and from those corporate entities to which the party obtained ownership. The Debtors are listed as signatories on the releases, releasing Blixseth "from any claim, right or demand that any such Edra Entity has, or may have against any of the Timothy Released Parties."[6]

After receiving his portion of the marital assets free and clear of any claims by, among others, the Debtors, Blixseth transferred his marital assets to Desert Ranch LLLP, a Nevada entity, and in return, received 98% of the limited partnership interests in the LLLP. The LLLP's general partner is Desert Ranch Management, LLC, a Nevada LLC. The LLC owns 2% of the LLLP and its membership interests are owned 40% by Blixseth, 30% by Blixseth's son, and 30% by two Trusts, whose Trustee is Blixseth's accountant, George Mack.

---

[6] In 2011, YCLT filed an action against Blixseth in the United States District Court for the Central District of California seeking to set aside one aspect of the Marital Settlement Agreement dealing with a release by BLX Group, Inc., f/k/a Blixseth Group, Inc., whereby Blixseth was released from any liability on two promissory notes totaling roughly $199 million. That matter is set for trial on June 17, 2014.

As a threshold matter, the Court found in AP-14 that the purported loans, as reflected in the three promissory notes dated September 30, 2005, discussed above, were in fact distributions, rather than loans. The Court next found that Blixseth's transfer of the loan proceeds to himself, and misappropriation of the loan proceeds for his own use and benefit, all in 2005, left the Debtors with debts they were unable to pay and constituted fraudulent transfers that could be avoided. Any finding in AP-14 as to the Debtors' solvency in 2005 has no bearing on the matters now before the Court since the bills at issue pertained to legal services performed well after 2005.

The Court, in AP-14, then turned its focus to one of numerous releases contained in the Martial Settlement Agreement and found that the Debtors were insolvent upon execution of the specific release at issue in AP-14. The Court would note that the language quoted by YCLT from the August 10, 2010, Memorandum of Decision in AP-14 comes from the release section of that decision involving the release of Blixseth by the Debtors "from any claim, right or demand that any such Edra Entity has, or may have against any of the Timothy Released Parties." The only entry in the billing statements set forth in Exhibits 1 through 11 this Court could find addressing any release was made on June 17, 2008:

> GAB  Analysis of issues relating to the assumption of the BGI debt by Mrs. Blixseth in the context of income tax consequence to Mr. Blixseth and issues relating to the structuring of the assumption and the release of Mr. Blixseth by BGI.

As is apparent from the above entry, Thornton Byron LLP analyzed the issues relating to the release of Blixseth by BGI. However, the Court can find nothing in the billing statements to suggest that Thornton Byron LLP was involved in proposing, drafting or reviewing the release of Blixseth by these Debtors.

13

As noted earlier, Thornton Byron LLP opposes being bound by any fact stemming from AP-14 on grounds: "The Court's Memorandum of Decision in *Blixseth v. Kirschner* is not binding on Thornton Byron LLP. *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940))." *See* Thornton Byron LLP's Statement of Genuine Issues, docket no. 226. As previously mentioned, to the extent permitted under the Federal Rules of Evidence, this Court took judicial notice of the August 16, 2010 Memorandum of Decision entered in AP-00014, and of an excerpt from John Thornton's trial testimony given in AP-14. The fact that the Court took such judicial notice of the foregoing does not automatically make the facts, as this Court found in that Memorandum of Decision, binding on Thornton Byron LLP. It merely means that this Court took judicial notice that, at least with respect to the August 16, 2010 Memorandum of Decision, that it was entered and that the excerpts attached to YCLT's Statement of Uncontroverted Facts were true and accurate pages from that Memorandum of Decision.

Subject to the principles of res judicata (claim preclusion) and collateral estoppel (issue preclusion), each separate proceeding should stand on its own merit. The test in Montana to apply collateral estoppel (issue preclusion) is stated in *In re Estates of Swanson*, 2008 MT 224, ¶ 16, 344 Mont. 266, 187 P.3d 631:

> (1) the issue decided in the prior adjudication is identical with the one presented in the action in question;
> (2) there was a final judgment on the merits; and
> (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication;

*In re Houston*, 2008 WL 5971043 (Bankr. D. Mont. 2008); *see also Safeco Inc. Co. of Am. v. Liss*, 2000 MT 380, ¶¶ 45, 46, 48, 51, 303 Mont. 519, ¶¶ 45, 46, 48, 51, 16 P.3d 299, ¶¶ 45, 46,

48, 51. Issue preclusion cannot apply in this case because the Judgment stemming from the Court's August 16, 2010 Memorandum of Decision in AP-14 is on appeal and is thus not final.

In addition, as for the exceptions discussed in *Taylor*, Thornton Byron LLP has not agreed to be bound by the litigation in AP-14; the Court is not persuaded that Thornton Byron LLP and Blixseth had a substantive legal relationship as to the matters tried in AP-14; Thornton Byron LLP's was not adequately represented by Blixseth in AP-14; Thornton Byron LLP did not assume control over the litigation in AP-14; Thornton Byron LLP is not attempting to bring a suit as the designated representative or agent of Blixseth; and YCLT has not shown or argued that a statutory scheme forecloses successive litigation by Thornton Byron LLP. In sum, YCLT has not established that Thornton Byron LLP was in privity with Blixseth in AP-14 as it related to the Debtors' release of Blixseth.

The sole fact this Court finds applicable to the matter at hand is the testimony of John Thornton in AP-14, regarding the nature of Thornton Byron LLP's practice:

> Then we'll create essentially what I will refer to as a personal Berkshire Hathaway for that client where they'll put substantially all their investment assets under that umbrella. And we do that because there's estate tax benefits, there's prorate [sic] avoidance benefits, there's centralized management, there's general creditor protection provided by the structure.

However, the foregoing testimony does not establish that the Debtor entities were insolvent when the referenced payments were made to Thornton Byron LLP. YCLT has failed to affirmatively show that no genuine issues of material fact exist and that it is entitled to summary judgment as a matter of law.

Therefore, the Court will enter a separate order providing as follows:

IT IS ORDERED that Thornton Byron LLP's Motion to Strike Portions of Plaintiff's

Reply Brief filed January 13, 2014, at docket no. 237 is denied.

IT IS FURTHER ORDERED that the Yellowstone Club Liquidating Trust's Rule 7056 F.R.B.P. Motion for Summary Judgment Against Defendant Thornton Byron, LLP filed November 19, 2014, at docket no. 194 is denied.

IT IS FURTHER ORDERED that Count III of YCLT's complaint is dismissed as moot.

        BY THE COURT

        */s/ Ralph B. Kirscher*
        HON. RALPH B. KIRSCHER
        U.S. Bankruptcy Judge
        United States Bankruptcy Court
        District of Montana