## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No.  **08-61570-11** |
| Debtor. | |
| **BRIAN A. GLASSER, AS SUCCESSOR TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,** | |
| Plaintiff. | |
| -vs- | |
| **Desert Ranch LLLP**, **DESERT RANCH MANAGEMENT LLC**, **TIMOTHY L BLIXSETH**, **BEAU BLIXSETH**, **THORNTON BYRON LLP**, **George Mack**, **JOHN DOES 1-100**, and **XYZ CORP. 1-100**, | Adv No.  **10-00015** |
| Defendants. | |

## MEMORANDUM of DECISION

At Butte in said District this 19th day of August, 2014.

Pending in this Adversary Proceeding is Defendant Thornton Byron, LLP's Motion for

Summary Judgment filed July 14, 2014, at docket no. 310, seeking dismissal of Counts II and IV

of Plaintiff's complaint.  Thornton Byron's Motion was accompanied by a Memorandum in

Support, a Statement of Uncontroverted Facts and an Affidavit of Daniel J. Gibbons.  Thornton

1

Byron also relies on the previously filed Affidavit of D. John Thornton, Jr. (Docket No. 227), the

Affidavit of Thomas D. Cochran (Docket No. 228), the Declaration of Jeffrey Shaw (Docket No.

195-1) and Exhibits 12-15 attached to the Plaintiff's Statement of Uncontroverted Facts (Docket

No. 196).  Plaintiff Brian A. Glasser, as Trustee of the Yellowstone Liquidating Trust ("YCLT"),

filed a Response, a Memorandum in Opposition to Defendant's Motion for Summary Judgment

and a Statement of Genuine Issues in Opposition.

## JURISDICTION

The "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in,

and limited by, statute."  *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th

Cir. 2010) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)).  In general, a

bankruptcy court's jurisdiction is prescribed by 28 U.S.C. § 1334(b).  In addition to granting

jurisdiction to bankruptcy courts over bankruptcy cases, the statute provides that  "the district

courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original

but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related

to cases under title 11."

YCLT asserts in its complaint that this is a core proceeding.  In the alternative, YCLT

alleges Courts II through IV are related to cases under title 11 and YCLT consents to entry of

final orders and judgments by this Court.  In its answer, Thornton Byron denies paragraphs 10

through 13 of YCLT's complaint, and objects to those paragraphs arguing they call for legal

conclusions.  Thornton Byron does not now specifically challenge this Court's statutory authority

to enter a final judgment or ruling on its pending motion for summary judgment.[1]  However, even

---

[1]  In opposition to an earlier motion for summary judgment filed by YCLT, Thornton
Byron argued that "the Bankruptcy Court does not have the constitutional authority to enter a

if Thornton Byron objects to entry of a final judgment by this Court in this matter, as recently explained by Chief Judge Dana L. Christensen of the United States District Court for the District of Montana, "if this proceeding is determined to be outside the constitutional limits of [the undersigned's] authority," the District Court can, on appeal, treat this Court's decisions as proposed findings of fact and conclusions of law. *Samson v. Western Capital Partners, LLC (In re Blixseth)*, — B.R. —, 2014 WL 3953144, *5 (D.Mont. Aug. 12, 2014).

## BACKGROUND

This Adversary Proceeding stems from four bankruptcies that were commenced on November 10, 2008: Yellowstone Mountain Club, LLC (Case No. 08-61570), Yellowstone Development, LLC (Case No. 08-61571), Big Sky Ridge, LLC (Case No. 08-61572), and Yellowstone Club Construction Company, LLC (Case No. 08-61573). Defendant Timothy L. Blixseth ("Mr. Blixseth") was the majority owner of and controlled the foregoing Debtor entities from 1999 until mid-August 2008. Mr. Blixseth, together with his former spouse, Edra Blixseth ("Edra"), and through the Debtor entities, developed what is commonly referred to as the Yellowstone Club, a members only master-planned unit development situated on 13,500 acres of private land near Big Sky, Montana.

In September 2005, Mr. Blixseth caused various of the Debtor entities to enter into a First Lien Credit Agreement dated September 30, 2005, with Credit Suisse, Cayman Islands Branch.[2] As negotiated by Mr. Blixseth, paragraph 2.6 of the Credit Agreement, Use of Proceeds, provided

---

final judgment under *Stern v. Marshall*, 131 S.Ct. 2594 (2011) and *Executive Benefits Insurance Agency, Inc. v. Arkison (In re Bellingham Insurance Agency, Inc.)*, 702 F.3d 553, 565 (9th Cir. 2012).

[2] Debtor Yellowstone Club Construction Company, LLC, was not a party to the Credit Agreement.

that "[t]he proceeds of the Loans made to the Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) pursuant to Section 6.3(ii), for investments or loans up to $142,000,000 into any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan."  The Credit Suisse loan was secured by substantially all of the Debtors' assets. The Credit Agreement provided the Debtors with a $375 million Senior First Lien Credit Facility that was funded in its entirety on September 30, 2005.  After payment of certain secured obligations, fees and costs, $342,110,262.53 was distributed to Yellowstone Mountain Club, LLC.  Of the $342,110,262.53, $209 million was immediately transferred by Blixseth to another entity owned by Mr. Blixseth known at that time as Blixseth Group, Inc. ("BGI").  The remainder of $133,110,262.53 stayed with Yellowstone Mountain Club, LLC.  Of the latter amount, Mr. Blixseth put $130 million in certificates of deposit and $3,110,262.53 went into a checking account.  In 2006, portions of the remaining funds held by Yellowstone Mountain Club, LLC were used to purchase a castle in France for approximately $28 million, property in Mexico for $40 million, property in Turks and Caicos for $28 million and a down payment of $12 million on property in Scotland.  Virtually all of the $209 million in loan proceeds that Mr. Blixseth transferred on September 30, 2005, from Yellowstone Mountain Club, LLC to BGI were either deposited in personal accounts held in Mr. Blixseth and Edra's names personally, or were used to payoff personal debts of Mr. Blixseth and Edra.

In December 2006, Edra filed a petition for dissolution of her marriage to Mr. Blixseth.

In December of 2006, Mr. Blixseth, through his accountant George Mack, retained Thornton Byron to provide business planning, tax planning and estate planning services.  Those services, according to Thornton Byron, included  analysis of: a conservation easement, business, tax and estate planning relating to the formation and structuring of Desert Ranch, LLLP and related entities; the actual sale and potential sale of the Yellowstone Club or certain assets of the Yellowstone Club; loan compliance for the Yellowstone Club; and tax audits involving the Yellowstone Club.  Thornton Byron does not dispute that it received from the Debtor entities the following payments for legal services:  $5,099.41 on February 29, 2008, $33,622.44 on April 8, 2008, $43,963.00 on May 15, 2008, $59,965.00 on May 15, 2008, and $64,947.24 on June 2, 2008, for a total of $207,597.09, which is an amount YCLT seeks to set aside as fraudulent transfers.

As previously noted, the Debtor entities were under the sole control of Mr. Blixseth from 1999 until mid-August 2008, when Edra was finally awarded the Debtor entities and BGI as part of a marital settlement agreement.  In another Adversary Proceeding between Mr. Blixseth and YCLT, Adversary Proceeding No. 09-00014 ("AP-14"), the Court entered a Memorandum of Decision on August 10, 2010,[3] which reads in part:

> It is clear that the Debtors began a downward spiral on September 30, 2005, that took them to the inevitable bankruptcy filing on November 10, 2008. At the end of 2005, the Debtors's audited financial statements showed $130 million in cash or cash equivalents.  The Debtors spent $70 to $80 million in 2006 acquiring assets outside the confines of the Yellowstone Club.  Factoring in the Debtors' annual cash needs of $25 to $30 million a year, above and beyond land

---

[3]  On December 5, 2012, the Court entered in AP-14 a Second Amended Judgment against Blixseth in the amount of $40,992,210.81.  The Second Amended Judgment was affirmed by the United States District Court for the District of Montana, and is currently on appeal to the Ninth Circuit Court of Appeals.

sales, the Debtors were left with just under $29 million of cash or cash equivalents at the end of 2006 and only $5 million at the end of 2007.

From 2005 through the filing of the bankruptcy case, the Yellowstone Club was persistently behind on its accounts payable.  When the Yellowstone Club needed cash, Moore, who took over as Comptroller at the Yellowstone Club in October of 2006, would make a request for money to Mack, who acted as the intermediary between Blixseth and Moore when Moore needed money to pay bills at the Yellowstone Club.  After making a plea for money, Moore testified that funds might or might not appear in the Yellowstone Club's accounts.  Moore testified that it was not uncommon to have to shuffle the Yellowstone Club's accounts payable due to a lack of money, with creditor and vendor invoices often going unpaid for 90 days or more.

Even though the Yellowstone Club was consistently struggling to pay its creditors, Blixseth continued to siphon money from the Debtors.  In addition to the Credit Suisse loan proceeds, Blixseth took approximately $90 million in distributions from the Debtor entities and later reclassified such distributions as loans.  For instance, Blixseth and BGI took $4 million plus of distributions from YD in 2003.  Also, the Debtors' 2004 year end financial statements show a distribution of $19,000,617.51 to Blixseth.  In 2005, Blixseth or BGI took total disbursements of $35,478,750.24 out of YMC.   Of the foregoing amount, $23,853,0000 was reclassified as a loan on March 13, 2006.  The evidence suggests that the 2004 and 2005 distributions were eventually reclassified as a $55 million note payable from BGI.

Despite the Debtors' consistent and often desperate need for cash from the time of the Credit Suisse loan to the date of the Debtors' bankruptcy petition, neither Blixseth nor Edra made a demand of BGI for payment on any of the BGI notes.  BGI also never made any type of consistent payment on the obligations.  The evidence shows that after September of 2005, the Debtors were only able to meet their financial obligations by selling bulk pieces of property at deep discounts.

Thornton Byron was not a party in AP-14.

This particular Adversary Proceeding was commenced on February 19, 2010, and

Thornton Byron, along with others, was named as a defendant.  Thornton Byron answered the

complaint on March 19, 2010.  This Adversary Proceeding has been stayed off and on for various

reasons.  However, following a telephonic pretrial scheduling conference held September 4, 2013,

the Court entered a scheduling order, that was later modified on January 28, 2014.  The modified scheduling order provided that all discovery was to be completed by June 12, 2014, that all expert witnesses for the parties were to be identified and their written reports submitted to opposing counsel on or before April 29, 2014, that depositions of disclosed expert witnesses were to be conducted on or before June 12, 2014, that any and all requests for amendments to the pleadings or to join additional parties in the action, if allowed, were to be filed not later than May 6, 2014, and that any and all pretrial motions, together with supporting memoranda or other materials, were to be filed and served on or before July 14, 2014.  The foregoing deadlines have expired and YCLT has not identified an expert or provided Thornton Byron with any expert reports.  In June of 2014, YCLT responded to an interrogatory that it had yet to determine whom, if anyone, it would call as a retained expert witness.  By separate Order, the Court has ruled that YCLT may not call any expert witnesses to testify against Thornton Byron in YCLT's case-in-chief.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute as to a material fact is genuine if

sufficient evidence exists for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*; *see also Russell v. Daiichi–Sankyo, Inc.*, 2012 WL 1793226 (D.Mont. May 15, 2012).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, at 248. The nonmoving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions. *Id.*

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court. As to materiality, the applicable substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Anderson*, at 248.

If a fact is found to be material, summary judgment will not lie if the dispute about that fact is genuine. If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment should not be granted. *Id.* In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–52. Though the *Anderson* Court stated that at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial, it also stated that if the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  *Id*. at 249–50.  In other words, the non-moving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts.*"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

Thornton Byron argues that summary judgment in its favor is appropriate because first, it cannot be bound by this Court's findings in AP-14.  At this juncture, the Court agrees.  Res judicata, or claim preclusion, bars the relitigation of a claim that a party has already had an opportunity to litigate or that the party could have litigated in the first action.  *Brilz v. Metro. Gen. Ins. Co.*, 2012 MT 184, ¶ 21, 366 Mont. 78, 285 P.3d 494 (citations omitted).  The elements of claim preclusion are: (1) the parties or their privies are the same in the first and second actions; (2) the subject matter of the actions is the same; (3) the issues are the same in both actions, or are ones that could have been raised in the first action, and they relate to the same subject matter; (4) the capacities of the parties are the same in reference to the subject matter and the issues between them; and (5) a valid final judgment has been entered on the merits in the first action by a court of competent jurisdiction.  *Brilz*, ¶ 22 (citations and quotation marks omitted).  As previously noted by the Court in the March 14, 2014, Memorandum of Decision, entered at docket no. 296, the Judgment in AP-14 is on appeal, and is thus not final.  In addition, YCLT has not shown that Thornton Byron was in privity with Mr. Blixseth.

Thornton Byron then argues that absent reliance on the Judgment in AP-14 that YCLT cannot otherwise prove its case without an expert witness.  The Court is not persuaded by such argument.  An expert witness may testify to help the trier of fact determine the evidence or a fact at issue. FED.R.EVID. 702.  This is particularly so when scientific, technical, or other specialized

9

knowledge will assist the trier of fact to decide a fact in issue. Thronton Byron's argument, at its

core, is that this Court cannot make a determination that the Debtors were insolvent when they

made the payments to Thornton Byron. While an expert witness may assist the Court in

understanding the evidence presented, the Court is not convinced that an expert is necessary for

the Court to determine whether the Debtors were or were not solvent on the relevant dates in

2008. Rather than present relevant facts, for example, facts tending to show that the Debtors were

solvent in 2008, Thorton Byron simply argues that they believe YCLT will not be able to prove

their case at trial. This Court is not able to make that conclusion until YCLT first presents its case

in chief. Therefore, the Court finds that there are genuine issues of material fact and that Thornton

Byron is not entitled to judgment as a matter of law. Accordingly, the Court will enter a separate

order providing as follows:

    IT IS ORDERED that Thornton Byron, LLP's Motion for Summary Judgment filed July

14, 2014, at docket no. 310, is denied.

                                BY THE COURT

                                HON. RALPH B. KIRSCHER
                                U.S. Bankruptcy Judge
                                United States Bankruptcy Court
                                District of Montana