UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC,**<br><br>Debtor. | Case No. **08-61570-11** |
| **BRIAN A. GLASSER, AS SUCCESSOR TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,**<br><br>Plaintiff.<br><br>-vs-<br><br>**Desert Ranch LLLP**, **DESERT RANCH MANAGEMENT LLC**, **TIMOTHY L BLIXSETH**, **BEAU BLIXSETH**, **THORNTON BYRON LLP**, **George Mack**, **JOHN DOES 1-100**, and **XYZ CORP. 1-100**,<br><br>Defendants. | Adv No. **10-00015** |

# MEMORANDUM of DECISION

At Butte in said District this 3rd day of October, 2014.

Marc S. Kirschner, the former Trustee for the Yellowstone Club Liquidating Trust ("YCLT")[1] commenced this Adversary Proceeding on February 19, 2010, seeking, among other

---

[1] On July 22, 2013, YCLT filed a motion to substitute Brian A. Glasser for Marc S. Kirschner as Successor Trustee of YCLT, which motion the Court granted.

things, to avoid certain alleged fraudulent transfers under MONT. CODE ANN. ("MCA") §§ 31-2-333 and 31-2-334, and 11 U.S.C. §§ 548(a)(1) and 550. On July 1, 2014, Defendant George Mack ("Mack") filed at docket no. 305 a Renewed Motion for Summary Judgment seeking his dismissal from this action or, in the alternative, that the Court find that Mack may not be held personally liable for any of the claims asserted in YCLT's complaint. Mack's motion is accompanied by a statement of uncontroverted facts, a memorandum in support, and the declaration of Kerry J. Shepherd. YCLT opposes Mack's motion.

## BACKGROUND

This Adversary Proceeding stems from four bankruptcies that were commenced on November 10, 2008: Yellowstone Mountain Club, LLC (Case No. 08-61570), Yellowstone Development, LLC (Case No. 08-61571), Big Sky Ridge, LLC (Case No. 08-61572), and Yellowstone Club Construction Company, LLC (Case No. 08-61573). The four aforementioned limited liability companies comprise the Yellowstone Club and will be referred to generally as the Debtors or the Yellowstone Club entities. Defendant Timothy L. Blixseth ("Mr. Blixseth") was the majority owner of and controlled the foregoing Debtor entities from 1999 until mid-August 2008. Through the Debtor entities, Mr. Blixseth, together with his former spouse, Edra Blixseth ("Edra"), developed what is commonly referred to as the Yellowstone Club, a members only master-planned unit development situated on 13,500 acres of private land near Big Sky, Montana.

In September 2005, Mr. Blixseth caused various of the Debtor entities to enter into a First

Lien Credit Agreement dated September 30, 2005, with Credit Suisse, Cayman Islands Branch.[2] According to Mr. Blixseth, "Mack informed him approximately 30 to 45 days prior to September 30, 2005, that 'if we took a distribution, that we would have a negative capital account to the point where he didn't think that an audit firm would or could audit the Debtor's companies.'" Blixseth thus negotiated that paragraph 2.6 of the Credit Agreement, Use of Proceeds, provide that "[t]he proceeds of the Loans made to the Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) pursuant to Section 6.3(ii), for investments or loans up to $142,000,000 into any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan." The Credit Suisse loan was secured by substantially all of the Debtors' assets. The Credit Agreement provided the Debtors with a $375 million Senior First Lien Credit Facility that was funded in its entirety on September 30, 2005.

After payment of certain secured obligations, fees and costs, $342,110,262.53 was distributed to Yellowstone Mountain Club, LLC. Of the $342,110,262.53, $209 million was immediately transferred by Mr. Blixseth to another entity owned by Mr. Blixseth known at that time as Blixseth Group, Inc. ("BGI"). The remainder of $133,110,262.53 stayed with Yellowstone Mountain Club, LLC. Of the latter amount, Mr. Blixseth put $130 million in certificates of deposit and $3,110,262.53 went into a checking account. In 2006, portions of the remaining funds held by Yellowstone Mountain Club, LLC were used to purchase a castle in

---

[2] Debtor Yellowstone Club Construction Company, LLC, was not a party to the Credit Agreement.

3

France for approximately $28 million, property in Mexico for $40 million, property in Turks and Caicos for $28 million and a down payment of $12 million on property in Scotland. Virtually all of the $209 million in loan proceeds that Mr. Blixseth transferred on September 30, 2005, from Yellowstone Mountain Club, LLC to BGI were either deposited in accounts held in Mr. Blixseth and Edra's names personally, or were used to payoff personal debts of Mr. Blixseth and Edra.

In December 2006, Edra filed a petition for dissolution of her marriage to Mr. Blixseth. In December of 2006, Mr. Blixseth, through his accountant, Mack, retained Defendant Thornton Byron, LLP to provide business planning, tax planning and estate planning services. As part of their services, Thornton Byron, on behalf of Mr. Blixseth, formed Desert Ranch LLLP ("Desert Ranch") and Desert Ranch Management, LLC ("DRM"). Thornton Byron also drafted for Mr. Blixseth a Trust Agreement for the Timothy L. Blixseth Family Trust. The Trustee Agreement was effective as of November 1, 2008. Through that Trust Agreement, Mr. Blixseth, as the Grantor, created, within the Timothy L. Blixseth Trust, separate irrevocable trusts with distinct characteristics: the Timothy L. Blixseth Family Non-Grantor Trust and the Timothy L. Blixseth Family Grantor Trust (collectively the "Blixseth Trusts"). Mack argues that he served as trustee of the Blixseth Trusts until he resigned on December 31, 2010.

Desert Ranch and DRM were both organized under the laws of the state of Nevada on May 10, 2007–Desert Ranch as a limited liability limited partnership and DRM as a limited liability company. DRM is the general partner of and owns a 2% interest in Desert Ranch. Mr. Blixseth owns the other 98% of Desert Ranch as a limited partnership interest. Mr. Blixseth owns 40% of DRM, Beau Blixseth owns 30%, and the Blixseth Trusts own the remaining 30% of DRM.

4

In August of 2008, Mr. Blixseth and Edra entered into a Marital Settlement Agreement. On November 1, 2008, Mr. Blixseth, as assignor, transferred various percentage interests in 15 LLCs to both the Timothy L. Blixseth Family Grantor Trust, as assignee, and to the Timothy L. Blixseth Family Non- Grantor Trust, as assignee. Mack signed both of the Assignment of Assets as Trustee. On that same date, Mack and Mr. Blixseth signed two additional Assignment of Assets, transferring the interests referenced above from the Blixseth Trusts to DRM. YCLT contends Mack participated in Mr. Blixseth's transfers of assets to Desert Ranch and/or DRM, and that Mack received and controlled assets that rightfully belonged to YCLT. Mr. Blixseth has since sold the majority of the assets that were transferred into Desert Ranch and/or DRM, and according to Mr. Blixseth, has spent the proceeds.

In another Adversary Proceeding between Mr. Blixseth and YCLT, Adversary Proceeding No. 09-00014 ("AP-14"), the Court entered a Memorandum of Decision on August 10, 2010,[3] which reads in part:

> It is clear that the Debtors began a downward spiral on September 30, 2005, that took them to the inevitable bankruptcy filing on November 10, 2008. At the end of 2005, the Debtors's audited financial statements showed $130 million in cash or cash equivalents. The Debtors spent $70 to $80 million in 2006 acquiring assets outside the confines of the Yellowstone Club. Factoring in the Debtors' annual cash needs of $25 to $30 million a year, above and beyond land sales, the Debtors were left with just under $29 million of cash or cash equivalents at the end of 2006 and only $5 million at the end of 2007.
>
> From 2005 through the filing of the bankruptcy case, the Yellowstone Club was persistently behind on its accounts payable. When the Yellowstone Club needed cash, Moore, who took over as Comptroller at the Yellowstone Club in October of 2006, would make a request for money to Mack, who acted as the

---

[3] On December 5, 2012, the Court entered in AP-14 a Second Amended Judgment against Blixseth in the amount of $40,992,210.81. The Second Amended Judgment was affirmed by the United States District Court for the District of Montana, and is currently on appeal to the Ninth Circuit Court of Appeals.

5

>intermediary between Blixseth and Moore when Moore needed money to pay bills at the Yellowstone Club. After making a plea for money, Moore testified that funds might or might not appear in the Yellowstone Club's accounts. Moore testified that it was not uncommon to have to shuffle the Yellowstone Club's accounts payable due to a lack of money, with creditor and vendor invoices often going unpaid for 90 days or more.
>
>Even though the Yellowstone Club was consistently struggling to pay its creditors, Blixseth continued to siphon money from the Debtors. In addition to the Credit Suisse loan proceeds, Blixseth took approximately $90 million in distributions from the Debtor entities and later reclassified such distributions as loans. For instance, Blixseth and BGI took $4 million plus of distributions from YD in 2003. Also, the Debtors' 2004 year end financial statements show a distribution of $19,000,617.51 to Blixseth. In 2005, Blixseth or BGI took total disbursements of $35,478,750.24 out of YMC. Of the foregoing amount, $23,853,0000 was reclassified as a loan on March 13, 2006. The evidence suggests that the 2004 and 2005 distributions were eventually reclassified as a $55 million note payable from BGI.
>
>Despite the Debtors' consistent and often desperate need for cash from the time of the Credit Suisse loan to the date of the Debtors' bankruptcy petition, neither Blixseth nor Edra made a demand of BGI for payment on any of the BGI notes. BGI also never made any type of consistent payment on the obligations. The evidence shows that after September of 2005, the Debtors were only able to meet their financial obligations by selling bulk pieces of property at deep discounts.

Mack was not a party in AP-14.

This particular Adversary Proceeding was commenced on February 19, 2010, and has been stayed off and on for various reasons. However, following a telephonic pretrial scheduling conference held September 4, 2013, the Court entered a scheduling order, that was later modified on January 28, 2014. The modified scheduling order provided that all discovery was to be completed by June 12, 2014, that all expert witnesses for the parties were to be identified and their written reports submitted to opposing counsel on or before April 29, 2014, that depositions of disclosed expert witnesses were to be conducted on or before June 12, 2014, that any and all requests for amendments to the pleadings or to join additional parties in the action, if allowed,

6

were to be filed not later than May 6, 2014, and that any and all pretrial motions, together with supporting memoranda or other materials, were to be filed and served on or before July 14, 2014. The foregoing deadlines have now expired.

In support of the instant motion, Mack contends the following facts are undisputed:

    1. Mack did not personally receive any of the assets transferred into the Timothy L. Blixseth Family Trust. Mack received those assets only in his capacity as trustee of the Timothy L. Blixseth Family Trust. (Exs. A and D to Decl. of Kerry Shepherd ("Shepherd Decl.").)

    2. Mack held title to the Trust assets only in his capacity as trustee of the Timothy L. Blixseth Family Trust. Mack has no beneficial interest in the Timothy L. Blixseth Family Trust. (Exs. B, C and D to Shepherd Decl.)

    3. Mack received no compensation for serving as trustee of the Timothy L. Blixseth Family Trust. (Ex. A to Shepherd Decl.)

    4. Mack resigned as trustee effective December 31, 2010. (Exs. A and B to Mack Decl. and Exs. E and F to Shepherd Decl.)

YCLT filed a response in opposition along with a statement of genuine issues. YCLT's statement of genuine issues does not contain any relevant facts that are not otherwise set forth above. YCLT does, however, argue in its response filed at docket no. 320 that "while Mack claims he resigned as trustee in December 2010, his assertion is contradicted both by Blixseth, who testified that he regularly consults with Mack on Desert Ranch business, and by Mack's failure to comply with the statutory requirements and express provisions of the Blixseth Trusts to effectuate a resignation."

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if sufficient evidence exists for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*; *see also Russell v. Daiichi–Sankyo, Inc.*, 2012 WL 1793226 (D.Mont. May 15, 2012).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, at 248. The nonmoving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions. *Id.*

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court. As to materiality, the applicable substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Anderson*, at 248.

If a fact is found to be material, summary judgment will not lie if the dispute about that fact is genuine. If the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, then summary judgment should not be granted. *Id*. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id*. at 251–52. Though the *Anderson* Court stated that at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial, it also stated that if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249–50. In other words, the non-moving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

In his memorandum of law in support of his renewed motion for summary judgment, Mack asks that he either be dismissed from this action or that the Court enter a finding that he cannot be held personally liable for any judgment that might be entered. In support of his request for dismissal, Mack argues that he is no longer the trustee of the Blixseth Trusts and that he is not a transferee under 11 U.S.C. § 550.

YCLT counters that genuine issues of fact exist as to whether Mack is still the Trustee of the Blixseth Trusts and whether he performed his trustee duties in good faith. YCLT argues that it included Mack in this Adversary Proceeding at trustee of the Blixseth Trusts based upon his role in and with the Blixseth Trusts and included Mack in his individual capacity because of his participation in Mr. Blixseth's fraudulent schemes. YCLT argues that Mack's involvement with Mr. Blixseth began as early as 2005, when Mack was advising Mr. Blixseth on how to

9

characterize the disbursements of the Credit Suisse loan. YCLT also argues that it was Mack who found and retained Thornton Byron for Mr. Blixseth and that Mack took an active role in creating Desert Ranch and DRM.

Mack relies on Exhibits A and B to docket no. 272 and Exhibits E and F to docket no. 276 to support his assertion that he resigned as trustee of the Blixseth Trusts on December 31, 2010. Exhibit B found at docket no. 272 is a letter from Mack to Mr. Blixseth dated January 24, 2011, which reads: "Pursuant to our conversation of December 11th, 2010, we have mutually agreed that I resign as manager and trustee of all Blixseth Trusts effective December 31, 2010." While Mack's letter was addressed only to Mr. Blixseth, the Trust Agreement specifically provides at page 29 of 65:

> **11.5 RESIGNATION OF TRUSTEE.** Any Trustee may resign at any time as Trustee of any Trust by delivering a signed and acknowledged written notice of resignation to:
>
> • each Primary Beneficiary of such Trust; and
>
> • each acting Trustee, or if no other Trustee is acting, to each immediate successor Trustee, if any.

Mack has not presented any evidence that he has complied with either the foregoing or Washington Probate and Trust Law.

Moreover, Mack's recollection of his alleged withdrawal was not quite as clear during a deposition taken January 24, 2014:

> Q. When this litigation was commenced, I understand that you were the trustee of certain trusts for -- related to Mr. Blixseth; is that correct?
>
> A. No, I was -- I thought I was the trustee of six-tenths of one percent of a trust for Morgan.
>
> Q. Okay. Tell me all of the trusts for which you are a trustee that involve Mr.

>	Blixseth or his family.
>
> A.	That's the only one I can remember.
>
> Q.	What's the name of that trust?
>
> A.	I don't know.
>
> Q.	Are you the trustee today of anything?
>
> A.	No. I resigned in 2010, I think.
>
> Q.	Resigned from?
>
> A.	That trust, Morgan's trust.
>
> Q.	Have you ever been trustee of the so-called -- well, I'll get to that in a minute. I believe it's the Tim Blixseth Family Trust, or the Tim Blixseth –
>
> A.	That's what I thought I was the trustee of, BGI or any Yellowstone entity?
>
> A.	I was paid by BGI.
>
> Q.	Was that strictly for the work that you were doing for World Club?
>
> A.	No, for doing work for everything.
>
> Q.	Okay. When did you resign as a trustee?
>
> A.	I think December of '10.
>
> Q.	December 2010, you resigned?
>
> A.	Uh-huh.
>
> Q.	Was that in writing?
>
> A.	Yes.

Additionally, the deposition testimony of Mr. Blixseth and Beau Blixseth does not provide further support for Mack's contention that he is no longer the trustee of the Blixseth Trusts. Specifically, Mr. Blixeth answered questioning as follows:

11

> Q. Has the management of the triple LP changed over the last - - since its formation in '08?
>
> A. At some point I think George Mack dropped out, and I don't remember when that was.
>
> Q. Was it within the last year?
>
> A. I think more than - - more than that.
>
> Q. Was it before this lawsuit was filed, do you know?
>
> A. I can't recall.
>
> Q. Is George Mack actively involved in Desert Ranch today?
>
> A. No.
>
> \* \* \*
>
> Q. Has – this lawsuit was filed a couple of two, three years ago. Have there been any changes to the organizational documents of Desert Ranch since then?
>
> A. I don't think there's been any changes other than the departure of George Mack.
>
> Q. Is that documented in writing when he left?
>
> A. I think he sent a resignation in. I don't recall what it is.
>
> Q. And what position did he have before? Was he a manager of one of the entities?
>
> A. I think he was co-manager, if I'm not mistaken.
>
> Q. Who took over his positition?
>
> A. No one.

Docket No. 276, Exhibit E. At a deposition taken October 19, 2012, Beau, like Mr. Blixseth, focused on Mack's role as a manager of DRM, and not his role as trustee of the Blixseth Trusts:

> A. I am a manager of DRM.
>
> Q. You are the manger of DRM?

12

A.  I'm one of the managers.

Q.  Who is the other managers?

A.  Tim Blixseth. And George Mack used to be one but he has since resigned.

Q.  When did Mack resign?

A.  Last year, last year.

Q.  Why did he resign?

A.  I don't know. You'd have to ask him.

Q.  What is your understanding of why he resigned?

A.  Well, I have my – my guesses. But he was getting older, and then this kind of stuff can wear on you.

Q.  Meaning the litigation surrounding all the Yellowstone stuff?

A.  Well, just this - - lawsuit.

Q.  This lawsuit?

A.  In particular.

Q.  Okay. So now there are only two managers of DRM?

A.  I believe so.

Docket No. 276, Exhibit F.

Having thoroughly reviewed the evidence presented by Mack, the Court finds that Mack has not met his initial burden of showing he withdrew as trustee of the Blixseth Trusts. The Court finds a genuine issue of material fact on this point.

Mack further contends that he did not receive any compensation for serving as trustee of the Blixseth Trusts. Mack's deposition testimony on this subject, while initially clear, proceeds to raise a question of doubt whereby a reasonable finder of fact could conclude that Mack did

indeed receive some type of compensation for his role as trustee of the Blixseth Trusts:

> Q. What was your compensation for servicing as trustee?
>
> A. Zero.
>
> Q. Never received any?
>
> A. No.
>
>                                 \* \* \*
>
> Q. Has Tim Blixseth ever transferred to you, personally, any of his assets?
>
> A. No.
>
> Q. And I think I heard you just say that as a trustee of the trust that you described earlier today, were you - - were you paid at all for that position as trustee?
>
> A. No.
>
> Q. Other than the work that you described for World Club that you talked about earlier, were you paid by BGI or any Yellowstone entity?
>
> A. I was paid by BGI.
>
> Q. Was that strictly for the work that you were doing from the World Club?
>
> A. No, for doing work for everything.
>
> Q. Okay. When did you resign as a trustee?
>
> A. I think December of '10.

Docket No. 276, Exhibit A. In the foregoing excerpt, Mack states he was compensated by BGI for doing work for everything. While Mack's entire deposition testimony may provide better context for that statement, the skeletal excerpts provided by Mack are not such that this Court can conclude, without question, that Mack did not receive any compensation for his work as trustee.

Next, Mack argues that YCLT cannot recover against Mack because, as a trustee, Mack is not a "transferee" under 11 U.S.C. § 550 or Montana's Uniform Fraudulent Transfer Act ("UFTA"), MCA §§ 31-2-326, *et seq*. Mack urges this Court to apply the Ninth's Circuit's "dominion test," as articulated in *In re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006), to determine who is a "transferee" under Montana's UFTA. According to Mack,

> "Under the dominion test, a transferee is one who has dominion over the money or other asset, [and] the right to put the money to one's own purposes. The inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished." *Id*. at 1070 (internal citations, alterations, and quotation marks omitted). According to the Ninth Circuit, "the dominion test we have crafted strongly correlates with legal title." *Id*. at 1073.

Docket No. 305-3, p.12. Conceding that he holds or held bare legal title to the assets of the Blixseth Family Trust while trustee, Mack goes on to argue that a person may hold bare legal title to assets but nonetheless lack dominion over such assets. Mack argues: " The Trust agreement permitted the trustee to distribute Trust assets to beneficiaries at his discretion, but the trustee had no discretion or authority to name or change beneficiaries. The Trust agreement also permitted the trustee to administer Trust assets, including by making investments, loans, and taking other actions to protect and grow the Trust corpus. In all events, however, the Trust assets remained solely for the benefit of Trust beneficiaries." *Id*. at p.14. Troubling on this point is Exhibit D to Docket No. 276, wherein it appears that Mack accepted certain assets into the Blixseth Family Trusts on November 1, 2008, and then on that same date transferred those assets to DRM. DRM is not defined as a primary or secondary beneficiary under the Trust Agreement, and the record tends to indicate that Mack was a manager of DRM at that time. Based on the record, the Court cannot conclude that Mack was not a transferee under the *Incomnet, Inc.* dominion test. As persuasively argued by YCLT:

And while *In re Incomnet* did not address whether a trustee qualifies as a transferee, another case relied upon by Mack, *In re Mastro*, considered this issue and determined that a trustee is a transferee because he has "dominion" over trust property. The *In re Mastro* court found:

> Given (1) the dominion test's strong emphasis on legal title, (2) Washington law indicating that a trustee holds legal title to trust property, … and (4) *Incomnet*'s directive that 'dominion' can exist even where an entity has limitations placed on its ability to direct the funds, this Court concludes that, generally, the trustee of a trust has dominion over trust property by holding legal title to the trust's corpus. Although a trustee's discretion may be bound by the confines of the operative trust documents *vis a vis* the beneficiary, that does not preclude a trustee from having dominion over the transferred assets.

*In re Mastro*, 465 B.R. at 615-616 (internal citations omitted). The court reached this conclusion even though the trustee did not use the trust's assets for his own benefit nor have the ability to use the assets for his own benefit. *Id.* at 590, 615-618.

Indeed, the Bankruptcy Court in *Mastro* went on to conclude:

> . . . Michael K, as co-trustee, shared authority with Mastro to administer and manage the Irrevocable Trust's affairs. By jointly holding legal title and jointly managing the Irrevocable Trust's affairs, Michael K exercised dominion sufficient to render him liable as an "initial transferee" under Section 550(a)(1). Although this Court believes that as a practical matter Michael K operated entirely at his father's direction and whim, and did not receive any personal benefit from participating in the Irrevocable Trust's transactions, that does not change the legal conclusion that Michael K exercised dominion.

*Mastro*, 465 B.R. at 617.

After concluding that Michael K was liable as an initial transferee, the court in *Mastro,* persuaded by the logic of Seventh Circuit Court of Appeals set forth in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir.2010), further concluded that Michael K was not personally liable but rather, was "liable only in his capacity as trustee." *Id*. at 618.

This latter conclusion by the court in *Mastro* serves as the basis for Mack's final argument that as trustee, he cannot be held personally liable for Mr. Blixseth's fraudulent

transfers. The Court tends to agree with Mack that he cannot be held personally liable for any judgment rendered against Mack in his capacity as trustee of the Blixseth Trusts. However, unlike the trustees in the cases cited by Mack in his brief, Mack is a litigant in this case not only in a trustee capacity, but also in an individual capacity. Mack's motion for summary judgment does not seek an order providing that Mack may not be held personally liable for the claims against him in his trustee capacity, but rather, seeks "an order providing that Mack may not be held personally liable for *any* of the claims asserted in plaintiff's complaint." Docket No. 305, p.2 (emphasis added). Mack cites no authority for such a broad and absolute release from liability. Furthermore, Mack does not allege any facts on the issue of whether he did or did not act in a manner that would establish personal fault.

For the reasons discussed above, the Court will enter a separate order providing as follows:

IT IS ORDERED that Defendant George Mack's Motion for Summary Judgment filed July 1, 2013, at docket no. 305 is denied.

BY THE COURT

*/s/ Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana